Good morning, Your Honors. Barry Sowards and Cleona Plunkett appearing on behalf of Delaney Gerald Marks, who is the appellant herein and petitioner below. If it pleases the Court, I would like to reserve five minutes for my rebuttal and in the time remaining, as it allows, to address two particular issues. The first issue is Claim 4 of the Federal Petition, which raises Mr. Marks' actual incompetence to stand trial during his capital proceedings. Does 4 include the first, the jury trial, or the fact that he didn't, that the judge didn't look at the second, or didn't continue to review whether he was incompetent? Sure. The Claim 4 is a claim that he was actually incompetent at the time of trial. So that would be the duty to continue to look at it? It springs from the duty to continue, but it is not, as I can quickly distinguish, a due process, a procedural violation of the right to not be tried while mentally incompetent would look to the trial judge's failure to renew the competency proceedings and hold a hearing at the time of the trial. As a technical matter, I'm a little surprised by your choice, but as a technical matter, did the trial court ever decide that question? The trial court three times denied. Well, it denied a hearing, but did it decide that he was competent? I mean, is that the same thing? That's what I'm asking you. Well, that's actually an interesting way of looking at it that I hadn't thought about, Your Honor. What the trial court said in effect was, and in fact was echoed in the district court, is he had a full-blown competency trial back in 1992, and I don't see anything that is different. Right, and that would go to the other claim that has to do with whether there should have been another competency hearing, but that's not what you're arguing now. That's correct. What we're saying is imagine, not exactly, but imagine it had never been raised in terms of a formal hearing, but there was evidence in the record that indicated this. Right, so that's why I asked you, did the trial court ever actually decide that question? Well, he said on several occasions, he said that Mr. Marks is, you know, appears to be competent, engaged, knows what he's doing. And then was that issue raised in the direct appeal as such, or was it raised in habeas? It was raised in direct appeal, the failure to have a new competency hearing. I know, but that's why I'm trying to separate them. Yes, Your Honor. But was the actual competence question raised in direct appeal? That he was actually incompetent? No, that he was incompetent, in fact, no, because consistent with this court's decision in Williams v. Woodford, the actual competence he claimed can include the information that is produced. And that's claim three, or am I mixing that up? That's correct. Yeah, there's a procedural issue that was raised, we raised that, and actually the district court incorporated some of the findings in the procedural issue to deny us relief on the actual issue. In other words, the difference is that this actual competence can include the material that was submitted at the 2002 habeas. Correct, additional, yeah, actually, the way it worked is that what we know from the record that was before the California Supreme Court, in other words, just looking at the trial record, is that at the time he was tried, Mr. Marks was suffering from a psychotic disorder that caused him to think, and I'm sure the court's familiar with this, but I think it's important to interject here in response to the court's question. It made him actually believe that he was the victim of a conspiracy that involved not only his defense counsel, but the prosecutor and the judge, presiding judge, Judge Horner, presiding over trial. And he thought what was going on, truly thought what was going on, was that they were all in league against him because someone had bribed them each $5,000, which he said they had hidden through their parents and spouses. And as a result of that conspiracy, substantial evidence of his innocence had been changed from the preliminary hearing. So he thought that John Myers, who was one of the shooting victims, was actually prepared to exonerate him, which of course was not true. So look, you recount some evidence, and there's pretty strong evidence that there was something not right going on here. But is there a case where the judge has held a jury trial on competency, and then either that has been reversed, or we've held that a second evidentiary hearing was erroneously not held? Because you seem to rely on Maxwell, but Maxwell was kind of ab initio. The district court never held an evidentiary hearing, and here the district court acted pretty responsibly, held a jury trial on this. Well, actually what happened was, and I agree with you, Your Honor, that the initial state court trial judge who held a formal competency hearing acted responsibly. Not just a hearing, a jury trial. A full trial, a jury trial pursuant to the California Penal Code. The problem was that within four months after that jury finding, another judge in a related case that Mr. Marks was involved in, at the same time, that actually arose out of his pretrial confinement in this case, declared a substantial doubt. Yeah, but why is that relevant? Because that's a new judge that's seeing this for the first time. I think we all agree that any judge who sees this behavior for the first time thinks, there's something wrong here, we ought to check it out. The first trial judge did that. There's no evidence that the second trial judge was aware of the first competency jury trial. It's not unusual that he would have thought, hey, there's a problem here, or a potential problem here. Right, and so the issue here for us is not that it is a failure any longer, that's a separate issue, whether it's a failure of somebody to renew yet again the hearing. The point is that the evidence before the California Supreme Court was sufficient because there was no other contrary evidence. What weight do we give to the jury's July 1992 verdict that Marks was incompetent? Is that verdict entitled to deference under 2254E1? It's entitled to deference that in July of 1992, he was competent to stand trial. I would submit that with all due respect to the jurors, who obviously worked very diligently, and Judge Balocci, who not only presided over the trial, but said, if this guy were in my arraignment calendar, I would send him for a 1368 evaluation. So he remained neutral to let the jury do its work. But what that says at that time is that he was competent then. As we know from all of the clearly established federal law from the United States Supreme Court, competency is a present here and now under Dusty versus United States determination. And not only is the question whether the individual has present ability to consult with counsel with a reasonable degree of rationality, but it's incumbent upon the trial court to continue watching it. So this is actually decided under Droke versus Missouri. That says, even if the person walks in the door and at that moment appears to be very, very sound of sound mind, if there is evidence. But they would either on the procedural ground. I'm sorry. Either on the procedural ground that you're not arguing on, or the actual competence that you are arguing. Presumably, there has to be some difference between what was true and when the trial was held on competency and what was true during the trial. So what would you point to in that regard? First of all, the lawyers were different, right? So you have a new set of lawyers who are now, again, insisting that they can't talk to this person and he's out of control. I mean, they said, essentially, he was actually pretty good for a long time. But now once the trial started, he's just falling apart, essentially. And what the experts explained is that, and what Justice Kennedy noted in the Panetti case, is that individuals can be very, very mentally disturbed and seem superficially intact until you start having in-depth discussions with them about the things that trigger their psychosis. And with Mr. Marks, it was being confronted with his voice that was on a taped interview with the police. And as trial counsel said, he wasn't faking. He wasn't being obstinate. He couldn't comprehend that that was his voice. And what about the trial testimony itself? The trial testimony itself completely supports a finding that he is and was mentally incompetent at the time. What do we give to Judge Horner's opinion, who said he was, or thought that Marks was competent? Yeah, I would say Judge Horner's findings, when you compare them to the actual record, are refuted by clear and convincing evidence. And so they constitute unreasonable determinations of fact. What Judge Horner said, and again, this isn't... But is that the standard on habeas? I mean, I don't think it's clear and convincing evidence when we're reviewing for habeas. That might be on direct appeal. But I mean, you have to show that it was clearly established that this was a violation of his rights at the time, you know, back in 1994. Your findings of fact that can be refuted on the record with clear and convincing evidence are determined to be unreasonable as a part of the court's opinion. I was kind of confused about that because the clear and convincing evidence is in E1. D2 says unreasonable finding of fact. I gather your claim that this was an unreasonable finding of fact. And so do we also do clear and convincing evidence, or the same thing, or what? It's... Well, actually, the standard... Thank you, Your Honor. The standard under Taylor v. Maddox and Hurls v. Ryan is exactly the same. But the circuit is ruled is... The question is, would a panel of this court, looking at the trial record, if it had come from a district court, conclude that the findings by the judge are reasonably supported by the record? And in this case... That's not clear and convincing. And I actually thought the question has been left open in our case law as to how the two fit together. And the one thing I know we're doing is deciding whether it's an unreasonable finding of fact. I don't know if we're doing clear and convincing. I think probably not, but I don't know. And I know it hasn't been decided, actually. All right. Well, I was just relying on the court's opinion in Zapata v. Vasquez, where the statements of the trial judge indicate why he or she is ruling, and they are refuted or not supported by the record. Well, right. But that's different from saying that you have to dispute it by clear and convincing evidence. Sure. No, I think that's right. You have to come in with clear and convincing evidence, and I don't know that you do. Then I won't assume that. But what weight do we give the state court's findings that marks outbursts in testimony, or at least at times rational and strategic, as I think the California Supreme Court found on direct appeal? Again, during his trial, it's the context of what he is deliberately trying to do, the finding. And what Judge Horner found is that he was deliberately trying to get his story to the jury by drawing their attention to information that he thought was erroneous or that his attorney had not properly covered. And as we explained in the brief, all of the facts that he was raising just emerged from this delusional system. So he was trying to tell the jury, for instance, that Mr. Myers would really exonerate him if only he, Mr. Marks, could have him say what he knew he was going to say. The same thing with Susan Yee, who only said she heard a commotion outside and didn't see anything. He, as our experts explained on post-conviction, had that confabulation, had it sort of mixed together with his ideation about his innocence. He thought she was going to testify in his behalf. There are a lot of criminal defendants who have stories that may not make a lot of sense. To me, what is more relevant here is the way that the trial made clearer than anything before is just how he communicated, which was completely, largely incoherently, and how he, I mean, not so much that he had outbursts. There are a lot of criminal defendants who have outbursts, which are not in their interest. But that he was always going off on things that weren't pertinent. He was talking about things that were kind of crazy, like black people aren't cannibals, and so on. And that was new information in the sense that it had the degree of incoherence and repetition and so on was exposed during the trial. I guess there was some bit of a preliminary hearing, maybe, but not necessarily. Well, yeah, I'd like you to address that. How much was that? Because that seems to be where your argument rests, was this substantial new information or substantial change? Because that's what sets this case apart from others. I mean, is there a case where there's been a jury competency trial and then we've reversed a later competency finding? Not that I'm aware of, no, but I do know that, for instance, with reference to Indiana versus Edwards, the United States Supreme Court opinion, they explained that that issue arose in a situation in which the defendant had been found incompetent to stand trial. And then several, I think, 12 months later, was found competent to stand trial. And then several months after that was found incompetent to stand trial. And that's why the... So what shows that this was substantially different then? I mean, to Judge Berzon's point, there's clearly some problems here. There was some incoherency. There was also coherent stuff that was said. But why is that different than what was actually already put before the jury two years prior? And just as a footnote to that, the substantial change in circumstance is the question about whether to have a new hearing at the trial court. We have moved beyond that to say that we can show now, irrespective of what should have been done then, that he was actually incompetent. But you're correct that, as we say in the briefs, that... Even to meet that, wouldn't you still have to show that there was something substantially different than the 1992 jury trial for competence? We would not have to show there's something substantially different from what moved the jury at the 1992 competency hearing, if, because his later observations by Judge Hyde, for instance, or other people along the line, if those went unaddressed, as they did after defense counsel made three separate motions for a competency hearing, if at the end of the line we can show, as the uncontradicted evidence in the record shows, that during that phase he was actually incompetent, then I don't need to say it doesn't matter. But in fact, the jury finding in July of 1992 is not at all controlling. What it says is, at that time, he was uncontradicted. What, from the 2002 record, that wasn't before the judge, I guess, do you think is pertinent here? I'm sorry, the 2002 record? Yes, because that's one of the reasons, I guess, why you wanted to do the actual incompetence. Exactly right. And what particular information? Sure. I mean, because I'm most interested in what actually happened at the trial, but you seem to think there's something in the 2002 record that matters. And what the, as I say, what the 19, what the 2002 record shows, and added to it, is first to allow the experts who examined him prior to trial in 1992 to actually see and confirm that their predictions of his psychosis and his measured brain damage as it played out under real trial conditions. And so, among others... What they're essentially doing was what I was just doing, which is to look at what he did at trial and saying that this confirmed, this is consistent with, this proves up what I said before, essentially. Yes, and that's part of it. Part of it was to say to the experts who saw him pre-trial, as Williams versus Woodford says, it's exactly the sort of process to follow so that you have a reliable retrospective finding, so that they could say, yes, that's exactly what we were talking about. Dr. Stein, for instance, identified these neurological impairments that resulted in what they called recollection of events that was contabulation. Some of it was completely the product of his psychosis. Some of it was the stuff he was exposed to, and he couldn't tell the difference. And at the same time, he had neurological impairments that resulted in what they called this fluent aphasia, which makes it impossible for him not to talk, and not to blurt out, and not to be heard. Drs. Goodickson and Rosenthal also confirmed that he had this fragmentary view of the evidence. They could see this. They predicted that, but then they could see it. And then we added in Dr. Fromming, Dr. Karen Fromming, who, based on her evaluation of him after trial, but looking at how it played out at trial, pointed out that because of his measured brain damage and the areas of the brain that were damaged, frontal lobe and temporal lobe, he could not create what was called a fund of information so that he could pay attention and track what was going on in the trial from day to day. And then Dr. Guer explained also that his neuropsychological testing, compatible with Dr. Fromming's, had identified the specific areas of the brain that altered or produced this very unique kind of communication package where Mr. Marks is spewing information. But that information is difficult to rely on because it was 20 years later. I mean, the testing was 20 years later. Yes, but as Williams and Odle, the court's decision in Odle versus Woodford, explains, that is permissible if what the new experts are doing is relying on contemporaneous evaluations and data. I mean, they were in part, but also they were doing new testing. Yes, new testing, which was designed to replicate the condition at a time of trial so that they could not create what was called a fund of information so that he could pay attention and track what was going on in the trial from day to day. The other thing we added was juror observations, that both juror observations and witnesses, prosecution witnesses, who just generally the theme of all of their statements was to say, we noticed that there was something wrong with this guy. Explicitly, they said, he didn't seem to comprehend what was going on. He didn't seem to know why he was there or what he was doing. Other people talk about how he became distracted with fixing his hair and chatting with people out in the audience and really not paying attention. But the sort of hallmark of their observations to a lay person is that he was unable to comprehend the proceedings, which is exactly what Dr. Cronin's. But just go ahead. There was evidence that he did understand the proceedings. He may have had some paranoia, but he understood the proceedings sufficient to provide a defense. It might not have been the perfect defense all the time, but he understood that his attorneys were representing him. He understood that I think there wasn't there even testimony that he only he didn't just verbally attack his attorney. He went further because he understood he wanted to get rid of the attorney and he had to do more than that. That suggests somebody who is cognitively thinking about this stuff. It's clearly not in the normal realm, but isn't that the fundamental right we're dealing with is does he understand the charges against him? Yeah, and I would say respectfully, sir, no, under Dusky versus United States. You think you didn't understand the charges? I'm sorry? You think you did not understand the charges? No, I'm saying under Dusky, he had that and have not only a factual, but a rational understanding of the proceedings. And so this is the problem. It's almost like little knowledge is a terrifying thing. He very much understood that he was facing a death penalty charge, capital murder. What's interesting is that the California Supreme Court's opinion on the direct appeal notes that bailiffs testified to overhearing a conversation that he was having. He thought he was being charged with three homicides, not two. So it isn't exactly a firm grasp of the facts of the charges. I mean, really, that's how we're going to decide things? No, you're right. The point is that his superficial understanding that he faced a capital sentence was trumped by the fact that he thought the people defending him, the people prosecuting him, the people judging him were in this conspiracy. Imagine how terrifying, truly, if I came into this courtroom and truly believed that you all were in a conspiracy. Counsel, we get same counsel. I just heard an argument last week where, you know, a very rational counsel was accusing a trial judge of conspiracy. So, I mean, I don't know that that's that crazy. Well, and we do have cases like Gracie versus Gramley, where Chief Justice Rehnquist said, you know, thankfully, this isn't, you know, this isn't the norm. But yeah, there are. So you have to separate out what are the facts from what is the reality. There have been judges who take bribes. That's, you know, that's what Gracie was about. I do want to ask you a question. Both sides appear to agree that the question is whether, for this claim four, is whether Marx asserted a prima facie case of incompetency at the state habeas proceedings. And I guess I'm just trying to figure out what is the California Supreme Court deciding when it holds that a petitioner has not asserted a prima facie case? What it has, according to the U.S. Supreme Court's decision in Colin versus Penholster, with the stipulation of the Attorney General, the California Supreme Court, as it explained in In re Clark, is deciding that taking the allegations in the petition as true, and then looking to see whether there is anything in the record that forecloses the ability. So two things, first of all, is why is that? I mean, you think whatever California thinks it's doing, we have, this is a federal standard and a federal issue. And so the question of what it is that we defer to is a federal question, isn't it? In other words, why are we worrying about what California is doing as opposed to what it ought to be doing for federal purposes? Or what constitutes a factual determination for federal purposes? What constitutes a factual determination for federal purposes? Right. Yeah, and I see, but... And secondly, and relatedly, the... Are you arguing that when you say you're proving actual innocence, are you arguing that you have proved, I mean, actual incompetence, that you've proved it or that you adequately alleged it in your stated habeas petition? We're saying we've adequately alleged it and supported it with unrefuted and unrefutable underlying evidence. And therefore, there should be an evidentiary hearing? And therefore, we should at least have an evidentiary hearing. And that is the standard that is enunciated both in Cohen versus Penholster, as well as Schreiro versus Landrigan, both authored by Justice Thomas. And it's also consistent with this court's holding in IRP in terms of when you get an evidentiary hearing in federal court. If the allegations in the petition taken as true would entitle you to relief, and they have not been foreclosed, then you're allowed to go forward. And what the California Supreme Court decides is, even if we take everything you say is true, including the unrefuted evidence about the conspiracy delusions, we don't think you can prove at a further hearing your claim. I'm seeing two minutes into my report. That's okay. I'll give you some additional time. We've taken a lot of your time. Well, thank you. You're saying that that's what the California reviews. My specific question is, when assessing whether the petitioner has asserted a prior case, the California Supreme Court reviews the trial record and assesses the merits of the claim. So I'm trying to figure out precisely what that means in this case. Sure. And just to see that in action, Penholster is a good model. It's a very good model. But what the petitioner said in Penholster is, my attorney was ineffective. They didn't develop certain evidence. Had they done so, there's a probability I would have gotten a different result. And what the U.S. Supreme Court said the California Supreme Court may have done, because, again, also a summary denial, at least at one level, is to say, look, even if you're right about the deficient performance, the new mitigating evidence that you're offering us really wouldn't have made a difference. We can tell right now from this record. Landrigan is the other good example, which, with the Arizona trial judge saying, you're telling me your counsel was ineffective for not presenting additional mitigation. I was the trial judge. I saw your client tell you if you put that on, he's going to raise holy havens. So I'm not going to give you an evidentiary hearing, because I know sitting here, you can't prove your claim. And that was an example of how the record contained, in the words of Landrigan, evidence which contravenes or forecloses the possibility of that proof. In this case, and I don't know if that answered your question. But what I was going to say, in comparison with this case, even the district court said that we had presented evidence before the state court which could demonstrate he was factually incompetent. And the only quarrel the district court had, in our opinion, was that it misinterpreted the holding in Williams versus Woodford that disfavors retrospective competency evaluations. But in Williams, that was a case where there was none of this rich history of the time of trial. Before you sit down, I wanted to ask you about the Atkins Claim 5. Yes. Assume I agree with you that the state trial court's rejection of that Atkins claim was based on unreasonable factual determinations. I think one is the state court wrongly found that Dr. Cowardin misstated the clinical definition of intellectual disability. And the second is the state court wrongly found that Dr. Woods did not review the 1994 trial testimony. If I agree with you on that, should I, and I'm just speaking for myself, what would be the result? Do we remand for a de novo review of your Atkins claim? If not, what relief do we give you? Yes. And we order. I would say on our record, we should be granted summary judgment because the state at no time has offered anything, any expert testimony or any other substantial evidence to refute the very detailed and exhaustive findings of Dr. Cowardin and Dr. Woods. Well, the state, you need to prove in addition to the IQ question, adaptive functions or whatever it's called, and which I don't seem very vague to me, but the one thing that the government did do was put on at least one witness who said, you know, he was pretty competent as a child. And I mean, that's a paraphrase and details, but that's what it was supposed to show. And also to try to debunk at least some of the declarations. So they didn't put on anything, any experts, but they put on something about the adaptive function. Is that right? Yeah. What they put on Michael Richard, who said, who said the cousin who said he may have visited the Marks family, possibly two weekends a month. As soon as he got there, he paired off with Mr. Marks, his younger brother, who is Kenneth, who was a year younger and rarely played with Mr. Marks. He also said he did not see, not that he was competent or not mentally retarded at the standard at the time, but he just didn't see anything one way or another. He's a layman. And even as a law enforcement officer, he never had any training in disabilities. I would, I would commend you saying it wasn't good evidence, but it's no evidence. That's honest. Well, it's, it was, it was evidence because Dr. Woods, among the other things he did that he didn't get credit for by the, from the trial judge is that he had actually interviewed Mr. Richards and found nothing that was inconsistent with that. But to follow up on Judge Medea's question, if we, I mean, it seems pretty clear that at least a fair amount of what the, just the trial judge said in his opinion was about why he came to the conclusion he did was not accurate. But the question is, is, do we then, do we separately look at the bottom line or do we say that's unreasonable fact finding because there were erroneous facts in the process of coming to the conclusion or do we look at the conclusion? Yeah. And I, and I think what you do is you look at, at the, the, the trial judge's actual statement, which I know, I mean, I'm saying if you look at the statement, you can say, well, he made some factual mistakes. But do we then, I mean, I guess one way to look at it is we look at them for harmlessness or we look at them or we say, well, forget what he said. The question is whether his bottom line is supported by the, the, the record. Yeah. And I think it's a, it's a combo. We can't forget what he said because particularly with Mr. Woods, and I should say, I'm sorry, Dr. Woods, I should say the Attorney General has conceded both the errors as to Dr. Cowartin and Dr. Woods. But with respect to Dr. Woods, what the trial court said is that error alone was fatal to the claim. So in a sense, need, need go no further. With Dr. Cowartin. Well, and there's a third thing too, which is that he, the trial judge discounted all of the declarations because he said three of them, the people who gave the declarations had said something in conflict at the trial. And, and plus what they said in conflict at the trial had nothing to do with very, or very little to do with the bottom line of, of, of Marx's mental ability. So that seems to me to be a third fairly large mistake or as well. So do you want to go on? Yes. Yes. And it also misled the judge to believe and adopted by the district court that any evidence of adaptive functioning deficits occurred after the age of 18. And in the process, he disregarded all of Dr. Cowartin's testimony, which relied on in part, both her testing currently to show that this was a congruent and consistent impairment. But dismissed all of the teachers. There were Joan Tatar and Fred, Frederica Reeves and Lucy Kitchen and Edwin Winberg, who explained Mr. Marx's adaptive deficits were documented beginning in first grade when he was showing a seven month delay, all the way through the being held back in second grade and performing under grade level after that, and being referred for evaluated for mental retardation. Thank you. I'll give you your five minutes and rebuttal. Okay. Thank you. Thank you very much. Uh-huh. Good morning. May it please the court. Deputy Attorney General Sara Farhat for the FLE. I'm going to start with the competency, go back to the beginning and start with the competency claim. I don't think there's any reasonable argument that there are facts on both sides of the case. There are facts that in the record that demonstrate that Mr. Marx was competent during trial, and there are facts that suggest that perhaps there are points where maybe he wasn't. But- So you agree that at times Marx's trial testimony was simply incoherent? There are times when, well, in short, yes. I think that that's a fair reading of the record, and I don't think that I can really make a fair argument to the contrary, but- How do we, and I think this is where you're going, but I just want to ask, how do you the conclusion that he was competent? So what I want to focus on at the outset, Your Honor, is this court standard of review, which is whether a fair-minded jurist reviewing these facts or reviewing the facts could agree that the state court's determination, and again, we're looking at the California Supreme Court summary denial for purposes of EDPA review, was consistent with U.S. Supreme Court decisions. And under that lens, there are facts from which a reasonable jurist could find or could agree that Mr. Marx was competent to stand trial. Actually, if you think, it depends whether you're discrediting entirely the pretty uniform view of the witnesses, of the expert witnesses, both at the time of the trial and later, that that's not the way to look at competence. In other words, you could pick out a few things he said that might have seemed coherent, but their point, consistent point, is that individuals with the sort of brain damage and perhaps schizophrenia that he had are going to sound coherent at least a little bit of the time. And that's not a measure of whether they are, in fact, impaired. So unless you discount all of that and you pull out a few times when he sounds like he knew what he was talking about, when they say, well, you can't do that, that isn't any measure of whether he is competent or incompetent, it doesn't seem to. In other words, this isn't an ordinary kind of sufficiency of the evidence issue in the sense that the fact that you can find a couple of facts that would be consistent with him being competent doesn't decrease the need to look at the whole situation. No, Your Honor, you do look at the whole situation. And again, if this court were sitting on direct review, it would be a different argument entirely, it would be a different story. But it's not. And so what you do have to do is look at the record that was before the California Supreme Court, which included, it's not just a few facts from trial. I mean, there are many facts and much evidence from the trial that demonstrates that Mr. Marks understood what was happening and could rationally assist counsel. And I can go through this. To me, and I was surprised that your opponent concentrated on that from the competency issue, because it seems to me that the much stronger one is his ability to confer with counsel. I mean, you had five lawyers, I guess, at different times insisting, I mean, and very specifically, that they could not, in fact, once they could talk to him, you know, for a long time until they were on top of the hearings or the trials, at which point he became just unable to confer in any rational way. And that was consistent among five lawyers who were quite adamant about this. So the fact of whether he knew where he was, that he only had a trial for his life, yeah, he did. But that doesn't seem to answer the question. So, Your Honor, you're focusing on the first prong, which is the ability to rationally assist defense counsel. That's a prong, but yes, whatever prong it is. So, yeah, he did have multiple attorneys. And I think the one defining feature that's apparent from the record is that Mr. Marks was a very strong-willed client. And there's nothing wrong with that. Defense counsel have to deal with that all the time. But he had very strong ideas about what he wanted to present to jurors and how he wanted to be represented as a person. And when he perceived that counsel was working against that interest, he became difficult. And you can see that in the competency hearing. So you have one defense counsel who actually testified at the competency hearing. There was no dispute, as Your Honor has noted, that he understood what he was there for. The issue was whether or not he could assist counsel. And the point that that attorney made in his testimony was that he kind of flip-flopped back and forth, which he worked with whatever attorney he felt was working in his best interest. And during the competency hearing, he was able to work with Attorney Sawyer without any problems because he felt that she was adequately representing him. And pre-trial, when Mr. Marks, you know, when defense counsel made the second request, or the first request for another competency hearing, it was because they had played his recorded statement. But they also said that he went into a room and talked to himself and screamed and yelled in a room by himself for 10 or 15 minutes. And I don't think that that goes against or cuts against or diminishes the other evidence that he had the ability to assist but chose not to when he felt that his interests were not being adequately represented. As far as I'm not sure I've seen a case in which there were six qualified mental health experts who testified that the defendant was incompetent to stand trial and there are no experts on the other side. And the state courts have found the defendant competent. Do you have any precedent supporting this result? What's your best precedent? I don't have a similar case, actually, Your Honor, but. So do you disagree with the several mental health experts who concluded that Marks suffered from brain damage, frontal and temporal lobe damage, significant memory impairments, and significant cognitive impairments? You know, I don't have the expertise to agree or disagree with those experts. Well, I understand you might not, but is that not relevant? It's, I mean, the record is what it is. Those opinions are in the record. The state court had them before it when it decided. But one also, I mean, isn't there a negative inference from the fact that the government couldn't come up with anybody to say the opposite? I don't think so, Your Honor, because the state is not required to put on a battle of the experts. Well, it's not, but it almost always does. I can't speak for what the prosecutor did below, Your Honor. And do you, so do you disagree with the results of the experts testing and their resulting clinical observations? I think that, again, there's nothing in the record and I don't have the expertise. I can't speak for the prosecutor, but I will say, Your Honor, that the trial court's reasons for discounting them are well-founded in the record. Which is? Which experts would you like me to talk about first, the competency experts or the later? Your best ones. I mean, I'm just trying to figure out if you're arguing Marx was competent because you disagree with the clinical findings of the experts, or do you agree with the experts underlying clinical findings but deem him competent anyway? I'm trying to figure out where the state is coming from on that. Your Honor, the state's position is that given the standard of review, there is a basis for the trial court's discounting of those opinions. And what's the basis? Well. By discounting six of them who are quite consistent with each other over a long time period. So, Drs. Rosenthal and Goodickson and Stein, those were the competency experts. And a jury found them unpersuasive, did not credit them because they found him competent in 1992. So, not only is the jury's competency finding presumed to be correct at that time, but what can also be drawn from that conclusion is that they didn't find those expert opinions to be convincing enough to find him incompetent. But they didn't necessarily discount them. And they didn't necessarily think they were not true. Well, Your Honor, if they did find them true, I find it difficult to believe that they would have found him competent. Well, they were weighing the evidence and they thought the opposite evidence was stronger, but that doesn't mean they didn't believe him at all. But I think a juror could – I think that that's a fair inference to be made. It may not have been the case, but I think it's a fair inference that can be made on the record that we have right now. But, for example, Rosenthal only interviewed Mr. Marks for half an hour. Query whether that was enough time to opine about competence, I don't know. But he still – At least some of them – another thing that was said was how come he could cooperate with the experts but not with the lawyers. And there was an explanation for that. But also, he didn't necessarily cooperate with the experts. I don't remember whether Rosenthal was one of the people who tried to see him another time but wasn't able to. Was Rosenthal one of those? But there were several experts who had to walk out of there first. He either wouldn't see them the first time or he wouldn't cooperate the first time, and so they had to come back another time. And I don't remember whether that was Rosenthal or not. It was one of them. It was either Rosenthal or Stein, Your Honor. So can I – you mentioned before the jury competency trial. What do we do with that? I mean, it seems like if the experts were presented – were all of these experts – all of these experts were presented, weren't they? Or not all? Rosenthal, Goodickson, and Stein. So three of the six? Three of the six, yes. Okay. And they testified. And they – and the jury found him competent notwithstanding that evidence. So can – is that enough? Do we just check the box and say, well, that's enough to say this isn't an unreasonable finding if a jury found it? I don't think it's enough, Your Honor. I think that it's a factor that needs to be looked at because it's part of the totality of the record that was before the state court when it made its decision. But as to those three – there's three others that we still have to look at. Okay. But as to those three, can we say those were presented to a jury and a jury – or you're saying we still have to do more? I'm saying that there's additional information in the record to support that fair inference that I was speaking of. But it's also true that those same people provided more evidence in the 2002 habeas. They did, Your Honor, but I would – So I don't know that you can just take whatever the jury decided about them in 1992 and say they would have decided the same thing in 2002 after the trial, because as we were saying, the trial did seem to bear out an awful lot of what they were saying. And they said that in 2002. Because, I mean, one of them is the delusional sort of evidence of Mr. Marks. I mean, it seems like the record shows that he was delusional at times, and so – and that's what's giving me some concern here is how do I reconcile – how do you reconcile – let me ask you – his delusional beliefs with competency? Especially when the doctors before and afterwards talked about that. I mean, that's the reason why he might not be competent. Can Your Honor – the delusional beliefs you're referring to are the ones where he believes there was a conspiracy? Well, that his lawyers had been bribed, that he – it was not his voice on the tape recording, that the photos were fabrications, that witnesses had exonerated him, that the preliminary injunction judge had found a conspiracy – a number of different, you know, references there. And I'll tell you what's kind of even more sort of giving me pause and troubling is – and I was going to ask you if you can point to anywhere in the record where the state courts addressed the issue of Mark's delusional beliefs and explained why, notwithstanding this, he was competent. So the competency finding was the jury's in 1992. The trial court didn't make any other – I mean, the rulings were on just these requests for additional competency hearings. California has an additional standard to meet when there's already been a competency hearing. But in connection with those, the trial court – I mean, at least – so at least the mid-trial hearing, counsel brought these delusions, some of them at least, to the court's attention, and the court considered them. And in denying that request – But there were a number of disregarded them. That's my question. Where can you point to in the record that they addressed that issue? Well, it's – there's nothing expressed in the record where the court said one way or another, you know, I have considered these – you know, defense counsel's argument about this conspiracy or whatever, and I disregard it. It's not in there. And so I think the presumption has to be that the court considered it because it was presented to the court. But what did the court say? I thought the court said these are not substantially different than what we heard two years ago. Right. Am I wrong about that? You're not. Is that – and that's not enough? He had to go further and address each – I mean, you could have brought a new expert in saying the same thing if it had already been presented. Does a judge have to keep doing this over and over again for every outburst and every new manifestation from the defendant? I don't think so, Your Honor. The problem was not with whether he understood but whether he could rationally assist. And so that was the problem in the competency hearing in 1992. That was the problem with the pretrial. That was the issue that was raised. And so – But are you – I mean, you seem equivocal about defending the district court's position in 94 on whether he did the right thing. Do you think the district court should have done more in considering these – this evidence specifically? I'm sorry. You mean the trial court, Your Honor? Yes, the trial court. I don't think so. I think that the trial court satisfied its burden under Kelly, which is a state court case, defining what needs to happen or the evaluation that needs to be made with a second request for a second hearing. There is – the defense counsel brought the evidence that it was viewing as problematic and interfering with the relationship. And the trial counsel pointed out a number of things that it had observed, not only in open court but in the Marsden hearings, because there were Marsden hearings that happened kind of simultaneously with – But the last – well, first of all, right now you're – the petitioner's lawyer is not arguing about whether there should have been more hearings. He's arguing in actual confidence. And as I said, I'm surprised by that. Or – but that is what he's arguing. So the question of whether the trial judge should have done something else is really not the question that is being argued today, right? If the procedural competency question is not being argued, then – I mean, he hasn't given up on it, but it's not what he's arguing today, right? From what I have heard, Your Honor, that sounds right. So the question of whether the trial judge should have had another hearing is really not the focus of today's argument. So the question is whether – but still, you'd think that the fact that there was a jury finding on something about the competency in 1992 has something to do with whether it's with the actual competence question or incompetence question. Yet much happened after that, which is the whole trial. And the lawyers – new lawyers, different lawyers – came in and recounted how they could not communicate with him at all. And you have the trial transcript. So there certainly is a very different record than what went to the jury in 1992. I agree with that, Your Honor. I don't disagree with that. I'm not saying that the 1992 competency determination is determinative of the substantive competency issue, but it is relevant. It is a factor that this Court needs to consider in applying the relevant EDPA deference standard. But in addition to that, we know it's a fair interpretation, or it's reasonable from the record, to reach the conclusion that Mr. Marks only started becoming difficult and choosing not to work with counsel when he believed his interests were not being adequately represented. Well, that's a characterization. That's not – I mean, the other version is he only manifested his extreme mental health problems when he was under stress, which was during the trial. It's not always during trial. It's only when he's disagreeing with counsel. And if that's when his mental illness is manifesting itself, it's a terrible coincidence. When he was testifying on his own behalf, it wasn't that he disagreed with counsel. He just couldn't answer the questions because it was going off on 100 different things. His sentences didn't make any sense, as was testified by the experts about how he communicated. That was completely – and how that manifested his mental health issues. That was quite borne out by how he testified at trial. His language, his repetition, his obsessions, and so on, being repetitive, and all things that they had predicted earlier and were manifested by what he actually did. And not when he was disagreeing with counsel, just when he couldn't answer a question. But he did answer the questions. He was answering them in the way that he felt forwarded his interests the best way. But that's an inference. I mean, that's – you're characterizing it that he was doing that. Is that what the district court found? I mean, was that – or does it – sorry, the trial court – or does that matter to us, whether that's an inference that the trial court made? I don't think it matters, Your Honor, because what this court is doing is it's looking at the record that was before the trial court. And again, I keep going back to the standard, but could a fair-minded jurist agree? And it doesn't have to be on the same facts that the trial court found. We look at those facts too, but I think that to the extent – So your point ultimately is, yes, everything that Judge Berzon said, that's problematic, but there was also this other evidence. And we have to look at that and say, could – based on this conflicting evidence, could the trial court have reasonably made that decision? That is essentially my point, Your Honor. And what was the other evidence, given the fact that there was no expert evidence at all? What was the evidence? So we know that Mr. Marks was able to meet with counsel at least 25 times before trial with no problems. We know that – Until – he wasn't. Until three days before when he was shown his statement. And that became problematic for his defense because in his mind he was going to deny that he had the gun at the time of the shooting. And that statement was problematic. But trial counsel was appointed back in 1992. There is nothing in the record between 92 and three days before trial demonstrating that Mr. Marks was having any kind of issues. There's no Marsden hearings. There's no Ferretto requests. There's nothing in the record. There was a – the judge who had said he wanted – he was concerned about his competency based on the assault of the detention officer, right? That's right, Your Honor. Yes. And had ordered a competency hearing. And then the state withdrew the charges. So that's not nothing, is it? It's not nothing. But I think it's a very minor thing because some of the points that were made earlier in the argument that there's nothing in the record to demonstrate or indicate that Judge Hyde knew about the prior competency determination, which was only four months before. But it raises the inference that the state did not want more about the competency to come out, doesn't it? I don't think that's a fair inference to make. I know the district court mentioned that in the opinion. But we have – the record – I'm not willing to make that inference. I don't think that's a fair inference to make. All right. But so he met with them. But the lawyer said – and then he turned into another person. They couldn't talk to him at all for the rest of the trial. And that's what's relevant. What was true during the trial, now what was true before the trial. But what's relevant is the reason. Is the reason why he's not able to communicate or the reason why he's not assisting counsel because he is unable to, unable to, or is it because he's choosing not to? And the answer is we don't know that. I mean, that's – My position is he's choosing not to. Because there is – But your position is even stronger than that. You're saying that's an inference that we need to take into consideration under the standard of review here. Yes. That given the record, that's – that inference – Obviously, it would have been better if you had an expert that said that. For the conspiracy theories and so on. Or for the incoherence in the way he actually behaved at trial. Unless you think he was putting the whole thing on. It was a very, very, very, very good actor. I'm not saying that how Mr. Marks testified was staged or a performance in any way. And I'm not denying that there are portions of his testimony that are rambling that may not be necessarily in direct response to the question. But as the trial court below found, and I think as the district court agreed, there is rationality behind it. There is a reason why he's going where he's going. He's answering how he's answering, not necessarily the way he – Black men aren't cannibals. And there were lots of things like that. That's the one that sticks in my mind. But there were a lot of just totally off-the-wall things. I agree. There are strange parts of the testimony. But again, standard of review and the totality of the record, a reasonable jurist could conclude that the state court was not wrong. And I guess, is that your – I wanted to ask you the same question I asked your friend across the aisle there. Because I'm trying to figure this out. What does it mean for the California Supreme Court to find that a petitioner has not asserted a prima facie case given Penholster, which states that the state court reviews the trial record and assesses the merits of the claim? What, in your view, what does that mean? Your Honor, the way that I read Penholster, Penholster's holding was that a summary And in coming to that conclusion, the court assumed that, rightfully so, that in denying, summarily denying, without issuing an OSC, the court took the allegations and reviewed the record in total. And so even this idea that there's a standard that applies on state habeas, that's not what's reviewed under AEDPA. What's reviewed is the conclusion, which is, as Penholster held, a merits adjudication. Well, it's a merits decision for 2254D purposes, two purposes – one and two purposes, and we've just so held an opinion. But the question is the merits of what? I mean, is it the merits of the question of whether he alleged enough, essentially, to prove the case in the face of contrary evidence? In other words, to say it's a merits ruling doesn't say whether it's the merits of whether there was a prima facie case or the merits of whether he proved it by a preponderance of the evidence. Your Honor, I think a merits adjudication means – I mean, a merits adjudication – the former, the prima facie case, is a pleading burden. And so I don't think that when the U.S. Supreme Court in Penholster is talking about a merits – Well, that's completely unofficial. I mean, if all the California courts are supposed to decide is whether there's a prima facie case, then to say they decided that he proved by – that he failed in his burden of proof substantively is just not what they did. They're both merits decisions, but they're different merits decisions. They – I see your point, Your Honor. I'm not sure. Our position is that Penholster's holding was merits adjudication, which means that the court has reviewed the record. And that's actually what they're supposed to do under California habeas procedure anyway. They do – Well, the merits of the claim – I mean, they assess the merits of the claim. Yes. I'm just trying to figure out, in your view, what that means. Because, I mean, it's supposed to assert a prima facie case that the Supreme Court did that – or, you know, that the state court reviewed that – the trial record and assessed that. But can I ask you about Atkins before time goes up? Do you agree that the state – I think it was the state trial court's 2006 decision rejecting the Atkins claim as the last recent state court decision for purposes of this case for FBI review? Because the state court found that Dr. Cowardin misstated the clinical definition of intellectual disability. And I just wanted to ask you, do you agree that this was an objectively unreasonable determination of the facts? So, Your Honor, I believe – so the last decision from the state court was the summary denial on the second state habeas petition, right? That was the – there was an Atkins claim. That was the only claim, I believe, that was raised in that second state habeas petition. The trial court conducted an evidentiary hearing on the Atkins claim. And I think those factual findings there are reviewed under E-1. And so you would look to see – Well, D-2. I'm sorry. D-2. E-2. Those would be presumed correct absent a clear and – absent clear and convincing evidence to rebut that presumption. But we know that a lot of it wasn't correct. That was what was actually in the opinion. I mean, some of his findings were clearly wrong. Some of his factual statements were incorrect. Some of – I agree that there were some parts of his credibility determinations that were incorrect. No, no, no. But there are also some factual – I mean, Dr. Coward in the slide accurately stated the 2002 AAMR definition, and that's at ER 2802, and uses the word originates. And Dr. Coward's testimony at the slide accurately reflects the 2002 AAMR definition. And the state court found that Dr. Coward had misstated the clinical definition of intellectual disability. And that's because the California Penal Code, which is what the court was tasked with applying, uses the word manifests. All right. So is – so you're saying this finding was objectively unreasonable, or do you agree that Marx is entitled to de novo review of his claim without the deference? I'm not saying that it's objectively unreasonable. I'm saying that the difference between originates and manifests was minor. It did not affect the ultimate – But he made a huge deal of that at the trial, Judge. He went on to refer to it by pages. It's scoring. I – that's in the record, Your Honor. And how about the Dr. Woods testimony? The state court rejected Dr. Woods' testimony on the ground that he had not reviewed the 1994 penalty phase testimony. So do you agree that this finding was an objectively unreasonable determination of the facts? I don't, because I don't think that's the factual finding that you're – that the court is tasked with looking at. I don't understand that. Well, the fact – it's – those are factors that the trial court – those are things that the trial court looked at in making a credibility determination about the ultimate factual finding, which was that Marx was not – or was competent, was not active, was not intellectually disabled. The trial judge discounted one expert for this erroneous reason about manifest versus originates, and another one who he said was interventionally dispositive because he didn't read the record when he did. And I would add the third one, which is that he discounted all of what – Dr. Cowan, is that right? Cowan, your honor. I'm sorry? Cowan. Cowan is how I pronounce it. All the declarations she relied on because he thought that three of them, or maybe four of them, were contradicted by the trial testimony, but not the other 34. And also the contradictions had nothing to do with whether – or little to do with whether Marx was intellectually disabled as a child. There were about other things. So do we just accept his discounting all 37 declarations when 34 or 33 of the people didn't contradict themselves in any place and the contradictions weren't relevant anyway? Speaking of the declarations first, there were four witnesses who overlapped that testified at the penalty and provided declarations, and the judge had – was the trial judge and also the competency judge. And so he made the credibility of determination to believe the penalty phase testimony over the declarations. The remainder of the declarations – But they weren't pertinent because the penalty phase evidence didn't say anything about whether Marx had intellectual disability as a child or had adaptive function problems. No, but what they did do was they described a much different upbringing, which contributed to the experts' opinions about intellectual disability. In a very minor way. I mean, some of them talked about that, but that wasn't their ultimate conclusion about – that was maybe why they thought he had these problems, but not what the problems were. But in addition, there are other reasons why not just these – I would suggest minor problems with the way the trial court construed the expert testimony. There are other reasons why he discounted them. Those weren't the only ones. All three of those experts demonstrated some clear confirmation bias when they reviewed the record in coming to their opinions. Neither Gurn or Cowardin reviewed any of the trial testimony from the penalty phase, and Woods, although he did, actively chose not to rely on the penalty phase. And none of them did any investigation about the discrepancies between those overlapping declarations, the ones who testified the penalty and who provided declarations. None of them investigated why there was a difference. They just whole-cloth accepted the state habeas declarations, which were obviously prepared in preparation for litigation. Is that true of any declaration that's ever been submitted in a court, hopefully? Perhaps, yes, but none of those witnesses came to testify. Who came to testify was Marx's cousin at the competency hearing. Who provided testimony? He had spent a couple weekends a month, every month for a number of years during Marx's childhood, and observed no behaviors that would have suggested any deficits in adaptive functioning. And so the trial court credited that, was able to see him in court testifying, and that's a credibility determination that is owed deference by the court. Thank you. Thank you, Your Honor. Thank you, Your Honor. Opportunity to address you again. Just very quickly, first, with respect to the standard of review that counsel mentioned, the issue is not whether a fair-minded jurist would agree that the trial court made a reasonable or unreasonable decision in finding Mr. Marx competent. The standard of review under Penholster is whether the California Supreme Court, in light of all of this evidence we've just been discussing, including the evidence that was produced after trial, whether they can reasonably say we cannot prove, if given an evidentiary hearing, that Mr. Marx was incompetent to stand trial. Those are two very different standards and questions and frames of reference. The Respondents' Counsel refers to the record that contains information about Mr. Marx wanting to get his story out or testify in the way he felt comfortable doing, and Judge Rouzon has mentioned one example, and of course there are literally dozens and hundreds. But among the sort of stuff he was talking about during guilt phase was the fact that he had a deed for $2 million to his grandmother's house, which was not relevant to the proceedings and seemed to be not connected in any way. And then we know during penalty phase, he talked about how while he was on the Nimitz, USS Nimitz, he somehow rescued the USS John Kennedy and took it to the Bermuda Triangle where he beat the Russians in Vietnam. They, of course, as far as we know, weren't involved in the Battle of Vietnam. The other significance I would say, and I appreciate very much actually Counsel's acknowledgment that there's nothing in the record to suggest Mr. Marx was malingering. What I think is very significant is in fact no one at any time, including the trial judge, questioned that this was a genuine perception of Mr. Marx's distorted reality inside this courtroom. Nobody at all questioned that. But when we look and also look at the evidence, observations of people in the courtroom, and I don't know that I touched on this in my last opportunity to speak with you, but we know from the United States Supreme Court's decision in Medina versus California and this court's decision in Williams versus Woodford that courts regard trial counsel as the ones who are best situated to give us a sort of real time where the rubber hits the road assessment of the defendant's competency. And in this case, referring to three excerpt of record 839 lines 25 to 27, what trial counsel said to the trial court, and I think this answer is a point that the respondent was trying to make to suggest that they were able to work with Mr. Marx. Counsel said, quote, he's absolutely unable to assist us in any way, shape, or form in defending him. And there are also excerpts in the record where we hear the trial judge, Judge Warner, tell Mr. Marx to be quiet because he's, quote, not letting your attorney represent you. So this was not in any way a bit of on again, off again. This was always unable to assist. And the explanation, when we look at the expert, those six expert declarations that we talked about that the respondent discussed with the court, we see that the unifying theme of all of them is not that Mr. Marx had some sort of encyclopedic understanding of the case, as the trial judge said. He had a kaleidoscopic view of it, and he could simply not separate out the fragments of real information from the fragments that came from his psychosis and the fragments that came from his impaired memory. And that is, in part, what was driving this in making it so impossible for him to be able to be competent. That's what we can prove, if given the opportunity, a fair opportunity, at an evidentiary hearing. And just to answer the one court's question, that was, by the way, Dr. Stein that had to go back for testing, pre-trial, because Mr. Marx had some imaginative view. No, there was more than one of them. There was more than one of the experts who had that problem. One was the testing, but another one, and no one talked to him at all in the beginning. There was more than one. Subject to the court's questions. Thank you. Thank you both very much. The case of Delaney G. Marx versus Ronald Davis is submitted. We are adjourned. All live. This court for this session stands adjourned.
judges: MURGUIA, BERZON, NELSON